Pages 1-42

1                    UNITED STATES DISTRICT COURT

2              FOR THE SOUTHERN DISTRICT OF CALIFORNIA

3

4

   UNITED STATES OF AMERICA,      )  Case No.  22-cr-01241-JAH
5                                  )
              Plaintiff,           )  San Diego, California
6                                  )  Thursday, June 16, 2022
       vs.                         )  Courtroom 2B
7                                  )
   MICHAEL SEAN TRIPPE,            )
8                                  )
              Defendant.           )
9  _____)

10

                    TRANSCRIPT OF DETENTION HEARING
11            BEFORE THE HONORABLE MICHAEL S. BERG
                  UNITED STATES MAGISTRATE JUDGE
12

13  APPEARANCES:

14  For Plaintiff:              CONNIE WU, ESQ.
                                United States Attorney's Office
15                              Southern District of California
                                880 Front Street, Room 6293
16                              San Diego, California 92101-8893
                                (619) 546-8592
17
    For Defendant:              ROLAND J. HADDAD, ESQ.
18                              8844 La Mesa Boulevard, Suite A
                                La Mesa, California 91942-5460
19                              (619) 460-2222

20  For U.S. Pretrial Services: DIANA DOAN
                                DANIEL KIM
21
    Transcription Service:      Peggy Schuerger
22                              Ad Hoc Reporting
                                2220 Otay Lakes Road, Suite 502-85
23                              Chula Vista, California 91915
                                (619) 236-9325
24

25  Proceedings recorded by electronic sound recording; transcript
    produced by transcription service.

2

<u>SAN DIEGO, CALIFORNIA  THURSDAY, JUNE 16, 2022  2:29 P.M.</u>

--oOo--

THE COURT:  Okay.  Mr. Haddad, shall we go forward on your matter?

MR. HADDAD:  Yes, Your Honor.

THE COURT:  Okay.  And Ms. Wu, are you ready?

MS. WU:  Yes, Your Honor.

THE COURT:  Is this on flight, detention -- I mean, risk of -- sorry -- safety, flight, or both?

MS. WU:  Both, Your Honor.

THE COURT:  Okay.  Go ahead.

MS. WU:  Thank you, Your Honor.  The Government has asked for detention for the Defendant in this case on both risk of flight as well as danger to the community.

Beginning with the 3142 factors, starting with the nature and circumstances of the offense, the charges are very serious.  One of the considerations is whether there is a crime of violence, and there is here.

The underlying conduct as to Defendant involves committing attempted murder and aiding and abetting kidnapping.  On June 9th, the state case was dismissed to defer to federal prosecution, but not to the same charges, as I think counsel had previously alluded to.  Here, he is being charged with aiding and abetting kidnapping, rather, in aid of racketeering and assault with a dangerous weapon in aid of racketeering.  The Defendant is

1   facing 20 years in prison if convicted on these offenses.

2          The federal case adds an enterprise dimension that was

3   not necessarily present for the state case, and that is where I

4   would like to start.  The Defendant is a validated and documented

5   member  of  the  Aryan  Brotherhood  enterprise.   This  fact  is

6   undisputable as he's been documented in the California Department

7   of Corrections or CDR databases.  He has a shamrock tattoo which

8   is only reserved for validated members.  And the fact that he is

9   an  Aryan  Brotherhood  member  is  also  corroborated  by  one  of

10  Defendant's own witnesses from his state attempted murder case.

11         The  Aryan  Brotherhood  is  an  extremely  violent  white

12  supremacist gang that was formed in the California prison system

13  in the 1960s and has expanded throughout the United States.  The

14  Defendant had to pay in blood to become a member because the Aryan

15  Brotherhood has a blood in/blood out policy, which means you are

16  expected to kill someone in order to get in.  And you don't leave

17  the Aryan Brotherhood until you die.

18         The Defendant is a member -- is the only out-of-custody

19  member in the San Diego area from the California chapter of the

20  Aryan Brotherhood, which confers significant power and --

21         THE COURT:  Wait, wait.  Say that again.

22         MS. WU:  The Defendant -- well, previous to coming into

23  federal custody, when he was out on bond, and even previous to the

24  offense conduct on December 7th of 2020, he was the only out-of-

25  custody  California  state  Aryan  Brotherhood  member,  and  that

4

1    conferred to him significant power because of his ability to
2    influence white supremacist gang members and white supremacist
3    outlaw motorcycle gang members that were on the streets here in
4    San Diego.

5        THE COURT:  The violent nature of the Aryan Brotherhood
6    cannot be understated.  But the purpose of this detention hearing
7    is not just to discuss the nature and circumstance of his offense,
8    which involves the enterprise, but to discuss the 3142 factors as
9    they relate to this Defendant specifically on an individual basis.
10   So I will spend most of my time diving into that.

11       With respect to the weight of the evidence against the
12   Defendant, he is charged with kidnapping and assault in aid of
13   racketeering, assault with a deadly weapon -- a dangerous weapon,
14   rather; specifically, stabbing the victim in the chest, both in
15   aid of racketeering.  I've touched a bit on the racketeering
16   aspect of it, but now I'm going to discuss the weight of the
17   evidence of the kidnapping and the assault with a dangerous
18   weapon, as it is especially relevant to the danger that he
19   presents to the community.

20       On December 7th of 2020, the Defendant and Wenbourne
21   used a woman named Candace Hadfield to lure a victim to a local
22   Auto Zone.  There, Mr. Wenbourne identified himself to the victim
23   as the leader of the Lakeside Gangsters, and Mr. Wenbourne made
24   multiple telephone calls in front of the victim and toll records
25   indicate that in the roughly hour or so leading up to Mr. Trippe

1   stabbing the victim, Mr. Wenbourne and the Defendant had at least

2   three contacts based on toll records, within that hour leading up

3   to what we believe was when the assault occurred.

4          Now, Mr. Wenbourne told the victim he had a gun and

5   directed the victim to drive them to a meeting place with Trippe,

6   which is corroborated by the presence of Mr. Wenbourne's DNA in

7   the backseat of Mr. -- of the victim's vehicle on the back

8   passenger door.  He sat directly behind the victim and he made him

9   drive to Fanuel Park located in Pacific Beach, which is a short

10  distance from the Defendant's residence.

11         Once they arrived at the park, Mr. Wenbourne and the

12  victim, who was unarmed, walked into the park while the Defendant

13  approached them from the other end of the park.  The Defendant and

14  the victim exchanged words.  The victim sensed that a physical

15  attack was going to come from one or both of either Mr. Wenbourne

16  and/or Mr. Trippe.  And while his attention was temporarily

17  focused towards Mr. Wenbourne, the Defendant stabbed the victim in

18  the chest with a knife.

19         The victim backed up in shock and the Defendant told the

20  victim to quiet down.  The victim told the Defendant that he was

21  under the wrong impression about him.  He explained that he was an

22  Aryan Brotherhood member from the federal prison system and not

23  the state system, and Mr. Trippe became visibly upset with Mr.

24  Wenbourne and told the victim that Mr. Wenbourne had reported the

25  victim was claiming to be from the California state AB, the

1    chapter of which he is a member.   The victim told the Defendant

2    that he had made a big mistake.

3            Now, the Defendant apologized to the victim, gave him

4    a hug, and chalked up the stabbing as a misunderstanding.   But he

5    told the victim to drive somewhere else before seeking medical

6    attention, not there at the park, because he lived close to the

7    park.

8            Now, the Defendant also explained to the victim that he

9    is tired of people claiming to be someone that they are not and

10   that he was going to start whacking people for misrepresenting

11   themselves.

12           Around this time, the Defendant's wife -- who I believe

13   is present here today in court -- approached the Defendant and the

14   victim.   She did not offer to render any aid, and to date it

15   remains unclear the extent to which she was involved or aware that

16   the Defendant was going to stab the victim.

17           The victim was able to drive himself to a nearby gas

18   station.   But the bleeding did eventually catch up to him where he

19   collapsed and he would have died without immediate medical

20   attention.   The victim suffered a two-inch wide stab wound to his

21   chest, and the stabbing punctured his lung, which then collapsed.

22           Investigators also contacted a bystander witness, that

23   had no relationship with the parties, who had called 911 on the

24   night of the incident and observed the confrontation between the

25   three individuals that I have just described.   That witness

1   reported that he was sitting in his car with the windows down in

2   the parking lot of Fanuel Park when he saw two males approach a

3   third male in an aggressive manner inside the park and that he

4   heard one of the males saying, "You're making a mistake, homie."

5   The three males to him looked like they were pointing to tattoos

6   on their arms and wrists and, having grown up in a gang

7   neighborhood himself, he felt like these males could be gang

8   members and that the interaction appeared to him to be gang-

9   related.

10          He positively identified the Defendant by photo.

11          So I believe the weight of the evidence, while the least

12   significant factor for the Court to consider, is overwhelmingly in

13   favor of detention.

14          Turning to the history and characteristics of the

15   Defendant, including physical and mental condition, family ties,

16   employment, financial resources, length of residence in the

17   community, past conduct, criminal history, and record concerning

18   appearances at court proceedings, the Government wants to be clear

19   that we readily admit he has some factors that do favor conditions

20   of release but that those factors are outweighed by the other ones

21   that strongly favor detention here by clear and convincing

22   evidence with respect to danger and certainly by a preponderance

23   to risk of flight.

24          I won't belabor the points that favor conditions of

25   release because I know that Mr. Haddad will spend a significant

8

1    amount of time discussing those, but I did just want to
2    acknowledge that his family ties and his length of residence in
3    the community, and some aspects -- and to a certain extent, his
4    physical and mental condition do count in the column of favoring
5    conditions of release.

6           You're going to hear that the Defendant is a cancer
7    survivor who has had a lot of surgeries and he's on a lot of
8    medications.  And his recent hospitalization, however, is not
9    indicative of his health at the time of his arrest, and that's
10   something I want to explain a little bit further.

11          He was hospitalized due to the need to detoxify him from
12   oxycodone because that is not a substance that federal facilities
13   allow inmates to be high on when being admitted to a federal
14   detention facility.  As a social worker proffered to the United
15   States, the Defendant is essentially on Percocets all day which
16   were prescribed to him.  But federal facilities don't allow or
17   prescribe that, but they do do other pain medication substitutes.
18   But once they learned of his previous cancer, they needed to do
19   their due diligence and get those records in order to evaluate
20   whether he needed the dosage of oxycodone that he was on or
21   whether they could safely detoxify him from it or whether he had
22   any other health issues that they needed to be aware of that would
23   impact this analysis.

24          They did ultimately decide that they could safely detox
25   him from oxycodone and now he is at GEO where he will have the

1  benefit of the Bureau of Prisons resources to make sure that he
2  gets the adequate pain medication and pain management that he is
3  certainly entitled to.

4       Now, what's relevant about his physical and mental
5  condition at the time of his arrest on this case, while he was out
6  on bond pending trial -- I think he was about a week out from his
7  scheduled state attempted murder trial -- is that he was riding a
8  motorcycle.  And I personally am not strong enough to ride a
9  motorcycle.  I've tried, but I was not strong enough to move a
10 motorcycle, which is at least 300 pounds, but the Defendant has a
11 long history and continuing to be able to do so and was doing so
12 at the time that he was arrested.

13      Riding a motorcycle, as many motorcycle enthusiasts
14 informed me, requires core strength, stamina, upper body strength
15 -- and we're not talking about Olympic power lifting.  But
16 especially when it comes to slowing down, making turns, and riding
17 around the county, as the Defendant is known to do, you do need to
18 have a baseline level of physical strength and stamina and that is
19 a level of baseline strength and stamina and physical wellness
20 that he had prior to being admitted to the hospital to detoxify
21 him from oxycodone.

22      I do not mean to diminish his health conditions in the
23 least.  As I stated, he is absolutely entitled to medical care
24 that would alleviate or manage his pain.  But before you hear the
25 list of medications that he is on from the defense counsel, I want

1  you to keep those points in mind.

2          Equally, if not more salient, is that the fact -- is the

3  fact that at the time that he stabbed the victim in 2020, on

4  December 7th, most, if not all of his current physical ailments

5  already existed.  And they did not stop him from stabbing a rather

6  large and tall man in the chest and puncturing his lung and

7  leading to him being charged with attempted murder.

8          Now, with respect to noncompliance with -- regarding his

9  previous appearances and compliance with court orders, I think

10  that I anticipate you're going to hear that while he was on bond

11  from the state case, there were no issues with him.  But I think

12  it's important to note here that there were no conditions of

13  release for the Defendant pending his state murder trial, aside

14  from a Fourth Amendment waiver, because he was able to post a $1

15  million bond.  So whether or not he was able to abide by any

16  specific conditions that were laid out by the Court simply did not

17  exist and are not relevant to determining whether or not he could

18  continue to stay out on bond as he did in the state case.

19          And also, Your Honor, as you know, the state -- the

20  state during the pandemic, particularly in the December 2020 area,

21  faced much larger challenges in detaining individuals than the

22  federal system did.   And while we absolutely had our own

23  challenges, they did not come close to the challenges that were

24  faced, and so I do not believe that a decision to allow the

25  Defendant to be -- to post a $1 million bond should be indicative

1  of whether or not that is appropriate here today in 2022 in

2  federal court.

3         With respect to his criminal history, I know that Your

4  Honor does have that in front of him and he has many convictions,

5  most of which are dated, but I think for the purposes of the

6  record, it is important to at least go over some of the highlights

7  and note that they -- his criminal history is extensive and

8  started from when he was 15, starting with burglary, grand theft,

9  taking of a vehicle.  That type of behavior persisted.  When he

10 was 18, he was convicted of possession of a stolen access device

11 in connection with a robbery of a postal vehicle.  In 1990, he was

12 also convicted of another driving -- or taking a vehicle without

13 consent or receiving stolen property.

14        And I would note that in this conviction from 1999

15 (sic), it noted that there was an escape from jail charge, though

16 the conviction -- the status of the conviction is not specifically

17 noted in the Pretrial report, so that disposition remains unknown.

18        In 1990, he had drug trafficking -- I'm sorry -- weapons

19 trafficking or explosives conviction.  And in 1992, very

20 significantly, he had an assault by a prisoner conviction.

21        In 1996, he was charged with assault with a deadly

22 weapon, but that count was ultimately dismissed in favor of a

23 conviction on a lesser count involving a stolen vehicle.  He had

24 numerous contacts with law enforcement regarding other crimes that

25 did not ultimately result in convictions, but certainly show a

1  pattern of unabated contacts with law enforcement.

2          Significantly, I would note that in 2003, records
3  indicate that he was convicted of battery by a prisoner.  And in
4  that case, the victim was a deputy chief warden at the facility.

5          He then had an additional drug conviction in 2014, and
6  then he completed a diversion program in 2016 and the next
7  criminal contact that's reflected, in the bail report at least, is
8  the 2020 attempted murder and assault with a deadly weapon state
9  case.

10         And so while most of his criminal history is dated, he
11  certainly has a history of violence.  And the fact that once in
12  2020, after a long pause, perhaps after he recovered from or was
13  in remission from his cancer, it appears that violence became
14  another feature in his life again.  And that is certainly of
15  serious concern to the Government.

16         But putting aside his ability to physically stab someone
17  in the chest, despite his medical conditions, he also has a far
18  more troubling capability as a result of being a powerful Aryan
19  Brotherhood member that does not require physical strength or
20  prowess, and that is his power to get people to do things because
21  of who he is, because he's an Aryan Brotherhood member and
22  everyone knows it.

23         I'm going to lay out two different events that took
24  place in 2019 during the course of the Government's wiretap
25  investigation that gives us insight into his illegal activities

1    that did not make it into his rap sheet and that also give us

2    insight into his ability to get people to do bad things to other

3    people.

4              According to the Government's Title III intercepts, an

5    individual by the name of Jason Mitchell was a prospect for an

6    Idaho chapter of the Laffing Devils Outlaw Motorcycle gang.  And

7    he and his girlfriend at that time had incurred a debt with an

8    enterprise associate that we -- that went by the moniker "Wild

9    Bill."  The Defendant's moniker, by the way, for reference in this

10   discussion, is "Thumper," and that is a well-known moniker of his

11   for a number of years.

12             So Wild Bill claimed to have attempted to collect his

13   debt from this prospect from the Idaho chapter of another

14   motorcycle gang, but the person refused to pay and essentially

15   said, "I'm not responsible for that debt."  Now, Wild Bill

16   complained to an individual named Charles Lynch that Wild Bill and

17   his five-year-old son had to run into this person to whom he owed

18   the debt, which led to the person that owed the debt confronting

19   Wild Bill and essentially challenging him to a fight to settle the

20   debt in front of his five-year-old child.

21             Now, that is, you know, objectively wrong in the eyes

22   of society, but also particularly insulting and perceived to be a

23   code violation in this world in which these individuals lived.

24   And Charles Lynch is an important factor and figure because he

25   essentially acts as the Defendant's secretary, not the office

1  typing type, but the gang type.  And apparently he also works as

2  an investigator for Mr. Haddad.

3          So Mr. Lynch becomes a key figure in the story because

4  the wiretap reveals that Wild Bill had reached out to Mr. Lynch to

5  help him rectify the situation because that individual, Mr.

6  Mitchell, had done this in front of Wild Bill's child and there

7  needed to be consequences for that.

8          Now, after reaching out to several people, our wiretap

9  intercepts showed that Mr. Lynch called the Defendant as the

10  ranking member of the enterprise and as an Aryan Brother to

11  enlighten the individual who was handling this, by the name of Mr.

12  Coloumbe, about how seriously Mr. Coloumbe needed to take the

13  situation and Mr. Lynch's order to collect the outstanding debt,

14  despite the fact that Mr. Mitchell had already now at this time

15  been beaten at their behest.

16          Now, after getting a phone call from the Defendant, Mr.

17  Coloumbe then called Mr. Lynch to assure him that he would arrange

18  for the gang members to attempt to collect the debt.  So he had

19  changed his position after receiving a phone call from the

20  Defendant and only after receiving a phone call from the Defendant

21  that lasted seven minutes and 20 seconds.

22          Mr. Coloumbe attempted to pacify the Defendant's

23  secretary, Mr. Lynch, and reassure him that he meant no disrespect

24  to any earlier calls, that he simply didn't realize who he was

25  talking to until the Defendant called him to clarify.

1          Mr. Coloumbe's change in tone and position regarding
2    this debt collection after receiving a call from Mr. Trippe,
3    despite the fact that they had already beaten the man at their
4    behest, made clear that Mr. Trippe had the clout to reverse his
5    prior decision, despite the assault having already taken place,
6    and to attempt further collection of the debt.

7          Now, in the intercepts, Mr. Lynch then received an
8    incoming phone call from Mr. Coloumbe and Mr. Lynch stated, "Now
9    you know who I am?"  And Mr. Coloumbe said, "I know who you are.
10   I know Thumper" -- who, as I told you, is Trippe's moniker --
11   "I know Thumper really well.   I was just talking to" -- and
12   referring to Wild Bill -- "I'm getting all this worked out."

13         Now, Mr. Coloumbe then reported to Mr. Lynch that the
14   person that needed to be punished "got smashed and his shit
15   stripped.  Let me reach out of there and see if I can get some
16   money," meaning they were going to still collect the debt, despite
17   the fact that they already beat the guy up.

18         Some days later, Mr. Lynch bragged to Wild Bill on the
19   wire- -- on a T-III intercepted call -- "Once Thumper calls, he
20   called me back with a different tone.  He started stuttering.  He
21   found out who everyone was."

22         There's a second event that I would like to describe
23   that also took place in 2019 that demonstrates the Defendant's
24   power to orchestrate violence irrespective of his physical
25   condition, and this involved the Peckerwoods Outlaw Motorcycle

1    gang.

2             On May 19th of 2019, investigators learned the Defendant

3    was operating a booth for his company, a clothing company line,

4    which is cleverly named Plead 5, at a motorcycle gathering in San

5    Marcos  at  the  Harley-Davidson  here  in  the  district.   This

6    gathering included members of several outlaw motorcycle gangs, as

7    confirmed  by  surveillance  by  several  law  enforcement  officers,

8    including   Forbidden   Saints,   The   Chosen   Few,   East   County

9    Peckerwoods.  And during this event, a prospect and some members

10   of the East County chapter of the Peckerwoods Outlaw Motorcycle

11   gang got  into  some  kind  of  altercation  with  the  Defendant  and

12   another   individual   that   became   violent.      And   during   this

13   altercation, the Defendant did sustain an injury to his face.

14            But as anybody in the white supremacist world knows, no

15   one is allowed to lay hands on a member of the Aryan Brotherhood

16   unless its governing body, called the Commission, has sanctioned

17   it.   So this assault, regardless of whether it was provoked or

18   warranted, had to lead to consequences.

19            Now, investigators were intercepting the telephone of

20   an individual by the name of Todd Johnson at the time of these

21   events.   Mr. Todd Johnson was the shot-caller -- maybe still is

22   the shot-caller -- of the Supreme Power Skins and saw the text

23   messages  between  Mr.  Johnson  and  several  other  individuals

24   corroborated this assault took place on -- against Mr. Trippe and

25   Mr. Clark and resulted in a surge of enterprise -- a surge of gang

1   members from various white supremacist criminal street gangs here

2   in San Diego as well as white supremacist outlaw motorcycle gangs

3   here in San Diego that all rushed to the scene in support of their

4   Aryan Brotherhood member, the Defendant.

5           Because we were on the wiretap at that time, the

6   Government was obviously obligated to ensure that no further

7   violence occurred once we became aware that there was a surge of

8   people that wanted to go and retaliate against anybody that had

9   injured Mr. Trippe, and so they flooded the area with police

10  presence and no further altercations occurred, but they did

11  observe a number of high-ranking individuals from the various

12  white supremacist criminal street gangs and outlaw motorcycle

13  gangs all arrived, including Mr. Johnson, who was the or one of

14  the shot-callers of the Supreme Power Skins, Mr. Brett Wenbourne,

15  who is the shot-caller -- co-Defendant in this case, but the shot-

16  caller of the Lakeside Gangsters, as well as the Hell's Angels,

17  which is a unique facet in this district, only because in other

18  districts the Hell's Angels do not bow to the Aryan Brotherhood,

19  but apparently Mr. Trippe is very compelling and has brokered

20  close relationships with them.  And so they also came ostensibly

21  to defend him.

22          Now, based on the interceptions on the wiretap

23  investigation of the phones in this case, and also based on toll

24  records from Mr. Trippe's phone, the Government was able to

25  determine that Mr. Trippe had been in contact several hundred

1   times with a wide range of individuals from any number of gangs,

2   including hundreds of contacts with an individual from the Rekkers

3   Outlaw Motorcycle gang -- this, by the way, for the time period,

4   is in the days following his altercation and injury in the fight

5   with the Peckerwoods.

6        He had hundreds of contacts with -- and maybe if I were

7   to add this up, they would be close to a thousand -- but contacts

8   with Rekkers Outlaw Motorcycle gang members, Hell's Angels gang

9   members, Forbidden Saints Outlaw Motorcycle gang members, the head

10  of the Peckerwoods Outlaw Motorcycle gang, which will become

11  relevant shortly, the Rekkers -- again, a different member of the

12  Rekkers Outlaw Motorcycle gang, the Henchmen, as well as a federal

13  Aryan Brotherhood member, Supreme Power Skins, and the Chosen Few.

14       Now, the reason why these contacts are relevant is

15  because investigators then learned through an anonymous

16  Crimestoppers tip that one of the Peckerwoods had been very badly

17  beaten and assaulted and his motorcycle stolen.

18       And at this time, Your Honor, I would like to give you

19  an exhibit for the purposes of this detention hearing -- and I'll

20  give a copy to Defense counsel.  Government Exhibit 1 is a copy of

21  the anonymous Crimestoppers tip that was submitted in the days

22  following the altercation in which Mr. Trippe was involved.  And

23  it reads that, "On May 23rd of 2019, three members of the

24  Peckerwood Motorcycle Club -- Aaron Lang, Matt Wood, and Johnny --

25  were forced at gunpoint by Darrell Deniston and Trent Solis," who

1    I indicated was going to be a relevant figure because he was a

2    Peckerwoods leadership figure at that time.  So essentially he was

3    -- this report is claiming that he was forced at gunpoint by

4    people from his own gang.

5                Now, "Darrell Deniston and Trent Solis" -- continuing -

6    - "to turn over their Harley-Davidson motorcycles and their club

7    colors," meaning their patches, which is an extremely valuable

8    part of any member's symbol -- because it's a symbol of their

9    membership -- "and they were beat with a bat so bad one guy is

10   still in the hospital.  They're scared to say anything because

11   they were told they would get killed.  The Aryan Brotherhood in

12   San Diego member, Michael Trippe, Kelly English, and Neil and

13   president of the Rekkers Motorcycle Club, ordered them to take

14   care of the three and take their bikes and to give the address of

15   the three so they can take them out in the near future if anybody

16   talked.  I am scared for my life and don't know what to do.  I'm

17   scared to talk to anybody.  I don't know what to do or where to go

18   next."

19                And as Your Honor can see from this exhibit, there are

20   additional specific facts including naming Michael Trippe as a

21   suspect, listing him as an Aryan Brotherhood member, and listing

22   an alias of his, a "Sean," though we know from records that that

23   is actually his middle name, but he often goes by "Sean" to his

24   friends.

25                Although the victim, Aaron Lang in this case, was not

1    cooperative in the investigation because of the very serious

2    injuries that he sustained during the beating with the baseball

3    bat at the hospital, the staff there were compelled to file a

4    suspicious activity report and law enforcement came.

5              Now, law enforcement investigated and asked him about

6    how he sustained these injuries and he told a false story about

7    how he sustained the injuries, which they were able to disprove

8    with further investigative methods -- by looking at surveillance

9    footage of where he claimed it should or would have taken place.

10             Because he was not cooperative with the investigation

11   to determine who had done this to him, they got a search warrant

12   for his phone, and that brings us to Exhibit 2 and Exhibit 3.

13             Exhibit 2 is a photo from Mr. Lang's phone showing the

14   injuries -- some of the injuries to his face and apparently he was

15   beaten so badly and damage was done somehow to his kidneys during

16   this beating, that he was, as he called it, "pissing blood."

17             And so Government Exhibit 3 is the image of his hospital

18   bag showing blood in his urine.

19             I think this event is important because it demonstrates

20   that regardless of what the Defendant's physical condition is at

21   any time, he is capable of getting people to do things at his

22   behest.  And when he does so, people get hurt.

23             So even though -- and I say this in addition to the fact

24   that the Government contends that he is, you know, physically able

25   to still stab people, physically able to ride motorcycles, despite

him having suffered very serious medical conditions -- but I
suspect -- and I bring these situations up because I suspect that
Mr. Haddad is going to emphasize his medical condition now, and
that is why I am raising these points -- to establish that it
actually doesn't matter, that even if the Court were to agree that
his physical condition does not make him pose a threat to the
community, the fact that he has this power and has exercised this
power to grievously hurt other people and the fact that people
start stuttering when he makes so much as a phone call,
demonstrates his extreme authority and his exercise of that
authority in the white supremacist space here in San Diego.

        The fact that he is facing 20 years is a very
significant factor that I think makes him a significant risk of
flight.   It is certainly not something that he thought he was
going to be facing when he was litigating the state case.  We know
that from indications from the preliminary hearings that the state
at that time indicated that that particular judge thought the case
was worth much less than that with respect to Mr. Trippe, and so
the stakes here are much higher because he doesn't have that judge
telling him that his case is not worth that many years.

        Here, the Government does intend to go for the 20 years,
and here there is no one telling him that it's not going to be
that big of a deal because he should probably only do a handful of
years, which is my understanding of what the -- a judge in the
state proceedings indicated he or she thought the case was worth

1 with respect to Mr. Trippe.

2             That obviously was prior to the case being charged
3 federally that added the aspect of racketeering as part of the
4 Aryan Brotherhood enterprise and at that time it was charged
5 simply as an attempted murder and assault with a deadly weapon
6 case.

7             So for all those reasons, Your Honor, the Government
8 simply does not believe that there are any conditions or
9 combination of conditions that would reasonably assure the
10 Defendant's appearances in court or the safety of the community.

11             THE COURT:  Thank you, Ms. Wu.  Mr. Haddad, if you'd
12 hold on one second.  I just have a couple questions for you.

13             MS. WU:  Sure.

14             THE COURT:  The ADW that's charged in the indictment,
15 is that the knife or a different weapon?

16             MS. WU:  Yes.  It's the knife.

17             THE COURT:  And how long was he on bond in the state
18 case?

19             MR. HADDAD:  Judge, I'm sorry.  I'm having a hard time
20 hearing you.

21             THE COURT:  How long was he on bond in the state case?

22             MR. TRIPPE:  Eight months.

23             MS. WU:  It sounds like it was less than a year, Your
24 Honor.

25             THE COURT:  What was it?

23

1          MR. HADDAD:  I'm sorry.  I didn't --

2          THE COURT:  How long?

3          MR. TRIPPE:  A little over eight months.

4          THE COURT:  Eight months?  Thank you.  And was it a cash

5    or property bond?

6          MR. HADDAD:  It was a cash bond through a bondsman.

7          THE COURT:  Okay.  Thank you.  And are there different

8    charges in the federal court now than they were in the state

9    court?

10          MS. WU:  Yes, Your Honor.

11          THE COURT:  Racketeering but it's the same event;

12    correct?

13          MS. WU:  The same underlying event, but the in aid of

14    racketeering adds the enterprise element regarding the Aryan

15    Brotherhood.

16          THE COURT:  You didn't charge a RICO charge, though;

17    right?

18          MS. WU:  Not yet.

19          THE COURT:  Okay.  And the charge from May of '19, the

20    Peckerwood charge, that was not charged?  The incident that you

21    gave me the paperwork on.

22          MS. WU:  No, not yet.

23          THE COURT:  Okay.

24          MS. WU:  And as I -- as Your Honor can probably read

25    between the lines, the victim in that case, Mr. Lang, was not

24

1    cooperative with the prosecution which certainly created obstacles

2    to being able to bring that one to justice.

3             THE COURT:  Okay.  And looking at his record, I

4    understand that there were -- there's numerous charges,

5    convictions, etc. from over 20 years ago, but within the last

6    eight years, the only one is a misdemeanor drug charge; is that

7    correct?

8             MS. WU:  I think that's --

9             THE COURT:  Well, I should say within the last 20 years,

10   he only has a misdemeanor drug charge which was eight years ago.

11            MS. WU:  According to our records, that appears to be

12   correct, at least according to the bail report.

13            THE COURT:  Okay.  Thank you.  Mr. Haddad.

14            MR. HADDAD:  You know, I don't know where to begin.

15            THE COURT:  Well, let's just start with the 3142 factors

16   and go through them from there.

17            MR. HADDAD:  No.  And I -- and, Judge, I need to --

18   before we do that, I'd like to address a couple of the comments

19   because it sheds light on the totality of the whole situation

20   which you're not getting a clear picture of.

21            Counsel is coming forward and making statements that she

22   has no basis to make or is assuming with no underlying facts.  So

23   let me start with the most basic.  So you know, in the state case,

24   he was charged with attempted murder and was charged in the

25   alternative with assault with a deadly weapon; to wit, the deadly

1    weapon being a knife.  So that charge was in the state indictment.

2            The charge that's not in the federal indictment is the

3    attempted murder.  And I can go on later and give you reasons why

4    all this has been done.

5            Now, what's outstanding is she says that we have a new

6    charge.  We have kidnapping.  The facts have not changed from the

7    state case to the federal case.  In the federal case, they charged

8    kidnapping.  Let me make this perfectly clear.  Counsel alluded to

9    the fact that she reviewed the preliminary hearing transcript.  In

10   that preliminary hearing transcript, the victim of this alleged

11   stabbing -- for no reason -- the victim testified in response to

12   questions put to him that he was not kidnapped, flat out testified

13   under oath that he was not kidnapped.  So to add a kidnap charge

14   is either based upon their belief or their ideology or what have

15   you, but the victim in that case said he was not kidnapped.

16           So you have a little more idea about the victim, the

17   victim at that time -- at the time this event happened was on

18   post-release -- federal post-release for armed robbery and for a

19   drug charge, for smuggling drugs into the prison.  The judge

20   opined, when ultimately concluding in this case, that she did not

21   believe everything that that person said.  Now, those are facts

22   that are undisputed.  So I want to put the thing in the real

23   perspective.

24           The other thing that bothers me is she sits here and

25   gives you three different episodes that I have no knowledge of at

1    all, not whatsoever and then alludes to Mr. Trippe's criminal

2    involvement, but there are no hard or fast facts about that and

3    then makes all these conclusions that are without merit just so to

4    dirty up the picture so you would set no bond.

5              So let me tell you this -- and let me tell you what

6    really bothers me.  I have in my possession -- and I made these

7    from the state file -- all the minutes from the initial

8    arraignment to the initial dismissal of the case.  Now, that took

9    a period of over a year and a half.  And here are the dockets to

10   corroborate what I'm saying.  And so to briefly summarize it for

11   you is the following:

12             There was an arraignment on the complaint which charged

13   attempted murder and assault with a deadly weapon back on January

14   -- on December 22, 2020.  Bail was set at that time for $3

15   million.  In December the 30th, eight days later, bail was reduced

16   to $1 million.  On September the 27th, an amended complaint was

17   filed and the preliminary hearing was heard on that on September

18   27th, '21 and the following day.  After the preliminary hearing

19   and after the comments made by the magistrate, on October the 5th,

20   2021, the court gives the 1275 hold.  And as the Court knows, a

21   1275 hold in state court is for the purpose of determining whether

22   or not the funds used for bailing out an individual are either the

23   fruits of a crime or illegally obtained, and the court released

24   the 1275 hold and specifically set out the following.  And this is

25   dated 10/5/21.

1    "1275 hold is lifted and the following individuals may

2    post bail on behalf of the Defendant:  Erik Girard (ph), John

3    Stace (ph), Ryan Glaucci (ph), and Margaret Ventura" and through

4    the bonding company.  So this was in a hearing that we had.

5         So what then happens?  On October the 15th, 2021, after

6    the preliminary hearing had been heard on the -- on September

7    27th, on 10/15, Defendant was arraigned on the information.  And

8    eventually trial on January the 14th, 2022.  Trial was set for May

9    the 2nd of 2022.  Trial was again reset on May the 2nd to June the

10   9th of this year.

11        On June the 9th, the case -- the district attorney

12   dismisses the case having engaged I guess in communication with

13   the -- and I can't speak for that, but it's my belief in having

14   engaged in communication with the District Attorney and dismissed

15   it outright and Mr. Trippe was immediately arrested on the

16   issuance of the indictment.

17        So this case -- the same set of facts, with no

18   aggravating factors since, took over 17 and a half months.

19   Defendant had been on bond with no problems and they dismiss it

20   and then they bring it over here.  And I can tell you why.  Now,

21   I don't have cold facts in writing to show you, but I can

22   deduce -- I've done this long enough -- is they had some -- they

23   had some problems in state court.  I don't know if the Court is

24   aware, but the gang allegations in state court have all been

25   modified and changed.  For example, you don't have a gang

1   allegation if the activity is for reputation as opposed for a

2   concrete criminal act.  What we have here is reputation at best,

3   if it's believed.

4          Secondly, the issue of whether the gang allegations

5   apply or not has now become bifurcated.  So if the Defense wants

6   to have a trial, they can request a bifurcation.  I also believe

7   that the independent witness who, by the way, doesn't see it quite

8   the same way as counsel does in her recitation, moved to Kansas.

9   I wasn't even able to get his address till about 30 days before,

10  28 days before and found out that he was in Kansas because I

11  wanted to subpoena him.  I didn't know he was in Kansas because

12  everything was redacted.

13         This is how this case has gone, from beginning to now.

14         So let me address a couple of the factors that she's

15  addressed so I can controvert them.  I'm going to start out --

16  she's -- counsel has assumed I'm going to do this and do that.

17  Well, since she's assumed that I'm going to center it all on

18  medical information, I happen just to have a letter that was dated

19  May the 9th, before Mr. Trippe was indicted, from The Cancer

20  Center Oncology Medical Group.  And if I may read it to you, Your

21  Honor:

22         "This letter is to inform you that Michael Trippe is

23  currently under my care for carcinoma of the ampulla of vater.  He

24  has been clinically free of disease since January 14, 2021

25  according to his PET/CT scan.  That same scan showed that he had

1   a thyroid nodule.  Mr. Trippe had an ultrasound-guided biopsy of

2   the nodule on April the 5th, 2022.  The pathology report that

3   accompanied the biopsy showed that the nodule was benign, but

4   there is the possibility that Mr. Trippe could have an autoimmune

5   disease called Hashimoto's Disease which can cause fatigue,

6   muscular joint pain, as well as memory lapses.  We referred him to

7   endocrinology specialists so he can follow through with an

8   appropriate diagnosis and treatment.  Please allow him to have

9   appropriate breaks, if needed."

10          So that letter was written on May the 9th for an

11  additional -- another purpose, but I thought it was appropriate

12  that we bring this here.

13          Now, let's talk about the other medical issues that we

14  have.  He had -- prior to today's date, he's had three surgeries.

15  Yeah, he was diagnosed with pancreatic cancer in 2016.  He had --

16  one of the procedures that he had was called a Whipple procedure,

17  a Whipple surgery.  They take out three quarters of your pancreas,

18  they take out part of your stomach, they take out gall bladder, ad

19  they take out another aspect that I can't pronounce.

20          MR. TRIPPE:  Duodenum.

21          MR. HADDAD:  And -- and he has been under the care of

22  these doctors since then  So I don't know about Counsel's ability

23  to ride a motorcycle.  I don't ride a motorcycle.  I don't know

24  what is needed.  But that's absolutely ludicrous to make a

25  statement like that.

1           Now, what happened is when he got arrested here, as you
2   know -- we were in here the other day and he wasn't produced for
3   this hearing and he was in the hospital, and so the Court kindly
4   stated, "Get an order so he can have contact with you."  Well,
5   when I went back to the office later in the afternoon, after doing
6   other matters, I was informed that he was released from the
7   hospital.  When they released him from the hospital and put him in
8   GEO, they cut his medications.  Because of his stomach, he has to
9   take certain enzymes to eat because, if he doesn't, then he has a
10  complete breakdown of his system.  He cannot eat.  And I can have
11  him recite to you what's taken place.
12          But I'd like to point this out.  When he was being
13  ushered at the hospital, the first doctor said, "No, we're not
14  taking him off any of his medications."  Then the FBI agent was
15  overheard to say, "Well, we have a doctor now that will take him
16  off his medications."  They cut it flat out.  He's been in GEO in
17  pain.  That's -- I'm only bringing that up because counsel
18  introduced that into issue.
19          In the past 15 years, as the Court noted, the only thing
20  he's had is a misdemeanor possession of steroid and it was
21  diverted and dismissed so, in essence, he's had no criminal record
22  in the last 15 years.  He's had no criminal record of violence in
23  the last 15 years.  Yes, you know, he does have a job.  Him and --
24  him and his wife have a little clothing company called Plead 5.
25          THE COURT:  Called what?

1          MR. HADDAD:  Plead -- Plead 5, you know, like take the

2    Fifth Amendment, which is very clever, by the way, and I've got

3    some of those hats and shirts sitting in my office and everybody

4    that sees them loves them.  So what they do is they sell online

5    and they sell at different events.  Well, you know motorcycle

6    groups, motorcycle "gangs," have festive activities, so he sells

7    them there.

8          Now, these three incidences that are allegedly to have

9    been involved with him, he didn't do anything.  In fact, at one,

10   according to counsel, he got punched out.

11         THE COURT:  Tell me about --

12         MR. HADDAD:  Pardon me?

13         THE COURT:  Tell me about his family or ties to the

14   community.

15         MR. HADDAD:  Oh, his family in the courtroom, Your

16   Honor, is his wife and his father-in-law -- they're here.  They

17   live in Spring Valley.  And they work.  They file taxes.  There's

18   no problems.  There's been no problems since the inception of this

19   case.  This case is going to go to trial.  There's no question

20   about it.

21         THE COURT:  How long has he been in San Diego?

22         MR. HADDAD:  How long?

23         MR. TRIPPE:  For most of my life.  I paroled in 2012,

24   discharged in 2013.  I've been home since 2012 after doing about

25   14 years that started with a grand theft auto.  And then the

32

1    (indiscernible) case is the only criminal (indiscernible).  That's
2    it.  That's all.  My last conviction was 21 years ago.

3              THE COURT:  The other thing I'd like to address, Counsel
4    indicates two aspects -- flight.  But there's no flight.  I mean,
5    he -- the medical condition wouldn't let him flee.  He would die.
6    He's stable here.  He's got a job.  He's got family.  In fact, his
7    father-in-law was one of the persons that helped post the bond and
8    was a hundred percent behind him.

9              Then as far as the -- as far as the continuing danger
10   to the community and criminal enterprise, there's no underlying
11   criminal enterprise in this case.  I'm not going to belabor you
12   with the facts, nor should I, and I understand that.  But
13   basically, at best, at best, it's an argument between two Aryan
14   Brotherhood members.  That's at best, Judge.

15             And all of a sudden, this little argument that took
16   place in Pacific Beach, that was investigated by the San Diego
17   Police Department and by the District Attorney's investigators,
18   rose to the dignity of federal prosecution.

19             So if you take the concept that the victim said he
20   wasn't kidnapped, that kind of throws out the first count.

21             Then if you take into consideration what may or may not
22   have happened at the park, which was in the middle of a
23   neighborhood with people all over -- and I'm not going to go into
24   a defense or what have you -- you begin to wonder about the
25   validity of this prosecution.  And all they're trying to do is

1  say, "We got an Aryan Brotherhood.  We've got the only guy that's

2  out in Southern California and we want to put him in jail."  And

3  I hate to say this -- and I may upset the Court -- but now we can

4  justify our funding.  It's nothing more than that.

5          So Counsel can go through a litany of all the rules and

6  regulations.  But if you take a look at it in absolute objection

7  sense, Mr. Trippe does not pose a danger nor does he pose a flight

8  risk, Your Honor, and he has stable ties to this community and is

9  willing to abide by the conditions that the Court sets.  And his

10 medical treatment is terrible at GEO.  His wife had to go down

11 there to plead with them to give him some medication.

12          THE COURT:  Does his wife own a home?

13          MR. HADDAD:  Yes.  They -- no.  They don't own a home.

14 They rent.

15          THE COURT:  What about his father-in-law?

16      (Speaking from the audience.)

17          THE COURT:  How much equity is in it?

18          FATHER-IN-LAW:  Equity is about 400,000.

19          DEFENDANT'S WIFE:  Your Honor, the house we're living

20 in is (indiscernible).

21          THE COURT:  And what?

22          DEFENDANT'S WIFE:  The house that I live in right now

23 that we're living is (indiscernible) also that he owns outright,

24 a townhome.

25          THE COURT:  Who does?

34

1          DEFENDANT'S WIFE:  Eric (Indiscernible).  That's who
2  (indiscernible).

3          THE COURT:  Okay.

4          MR. HADDAD:  It was somebody else that posted it with
5  the bondsman.  They don't own the home.  They live -- it's a
6  rental that they have.  But you have people rallying around him
7  that the court authorized as being valid individuals, sureties.

8     (Pause.)

9          MS. WU:  Your Honor, may I be heard?

10          THE COURT:  Oh, no.  I think I've heard quite a bit on
11  this bond.  We have a lot of other cases we still have to get
12  through, so I think I've got a pretty good handle on it, but thank
13  you.

14          MS. WU:  Your Honor --

15          THE COURT:  If it's something new -- I don't want to go
16  over the same facts.

17          MS. WU:  I would like to correct some of the facts,
18  actually.

19          THE COURT:  Okay.

20          MS. WU:  Mr. Haddad did a very good job of justifying
21  his funding and I would like an opportunity to justify mine.

22          The issues I think are threefold.  One is raising the
23  fact that the victim in the state case allegedly stated -- he did
24  state at the preliminary hearing that he was not kidnapped.
25  Obviously, that is a legal term.  But what he did say in that

1   preliminary hearing is that he believed he had to go and that he

2   believed Wenbourne when he said he had a gun.  So this notion that

3   the victim somehow claimed that the kidnapping crime didn't occur

4   in fact or in law is not true.

5          THE COURT:  Quite frankly, I'm not taking anything that

6   was said or done at the preliminary hearing into account because

7   I wasn't there.  I haven't read it.  It has no bearing on my

8   decision.

9          MS. WU:  I would like to discuss his medical treatment

10  since this seems to be a facet that I think warrants a response

11  and correction.

12         THE COURT:  I'm really not even looking at the medical

13  treatment because I think he can get fine medical treatment in

14  custody, so that's not a part of my decisionmaking.  I'm looking

15  at the 3142 factors solely.

16         MS. WU:  Are there any factors that I might be able to

17  have an opportunity to respond to if the Court is inclined to

18  grant some conditions of release?

19         THE COURT:  Well, you certainly can, but let me go

20  through the factors now.

21         So looking at the 3142 factors, obviously the weight of

22  the evidence is -- there is probable cause to believe that he

23  committed the offense, but that is given the least weight.

24         As to his character itself, there was no evidence.  I

25  would deem that as a neutral.

1           As to his physical and mental condition, his physical

2    condition obviously is -- he has medical needs and medical care

3    needed, but I'm not going to say that that weighs in favor of bond

4    or detaining him because I believe he can get adequate medical

5    treatment in custody, so I would deem that factor as neutral.

6           As to family ties and community ties, he has indicated

7    he lives here or has lived here almost his entire life, if not all

8    his life.  His father-in-law and wife are in court.  He does have

9    family ties.  That weighs in favor of setting bond.

10           He is currently employed as a clothing -- I don't know

11   if I would say "store" -- distributor, along with his life, so he

12   is employed or was employed up until the time he was incarcerated.

13   That would weigh in favor of setting bond.

14           As to financial resources, I have not heard evidence as

15   to his personal financial resources, but his father-in-law and

16   apparently friends, of which were named, apparently are willing to

17   assist, so apparently he does have financial resources, which

18   would weigh in favor of setting bond.

19           His length of residence in the community, as I indicated

20   earlier, is almost lifelong, so that would weigh in favor of

21   setting bond.

22           His past conduct was outlined quite detailed by Ms. Wu

23   and I think that past conduct weighs in favor of detaining him.

24           History as to drug or alcohol abuse, there was no

25   information one way or the other, other than a misdemeanor eight

1    years ago of which he did diversion and completed that

2    successfully.  I'll take that as a neutral.

3          Criminal history, he has significant criminal history,

4    but almost all of it is over 20 years old, other than one

5    misdemeanor eight years ago, so I'm not going to say that that

6    favors bond or detaining him.  I would see that as a neutral.

7          His record at court appearances, his prior -- most

8    recent one was the prior pending state case in which he apparently

9    made his court appearances for the past year and a half while out

10   on a million-dollar bond.  I did not hear any indication that he

11   failed to make any of his court appearances, so that would favor

12   setting bond.

13         All in all, weighing the factors in favor of detaining

14   him as opposed to those of setting bond, I do believe there are

15   condition or a combination of conditions I can set that will both

16   protect the community and ensure that he does make his court

17   appearances, so I'm going to deny the Government's motion to

18   detain him and I will set bond.

19         I am going to set bond.  It's going to be a different

20   bond than you had in state court, sir.  This is going to be a

21   performance bond.  In state court, it's an appearance bond.  In

22   state court, all you have to do is show up in court.  Here, you

23   have to do certain things and make sure you don't do certain other

24   ones.  And so there are going to be certain conditions.

25         One is that you not leave San Diego County.

1             I will set the bond in the amount of $400,000, secured

2    by the co-signatures of two financially-responsible adults, with

3    a trust deed to the United States.  So somebody's going to have to

4    put up their house or homes for your bond.

5             If you are released, you are to maintain full-time

6    employment, schooling, or a combination.

7             You are to reside with a family member or surety or the

8    residence approved by Pretrial Services.

9             You are to participate in a location monitoring program

10   which is basically GPS.  The type of program will be up to

11   Pretrial Services.  It might be either an ankle monitor.  It might

12   be phone technology.  It's up to them.  But you would be confined

13   to your home except for work, employment, medical, attorney, court

14   appearances, etc.  At any time you leave your home, it would have

15   to be authorized and detailed by Pretrial Services.

16            Do you understand?

17            MR. TRIPPE:  Yes, sir.  I do.

18            THE COURT:  Defense counsel is to notify Pretrial if you

19   get a bond put together and he is to be released from custody by

20   ten o'clock the following business day to report to Pretrial

21   Services for installation of any Pretrial -- any location

22   monitoring device.

23            Do you understand?

24            MR. TRIPPE:  Me?  Yes, sir.

25            THE COURT:  That was to you, Mr. Haddad.

1    MR. HADDAD:  Oh, you looked at me.

2    OFFICER DOAN:   Your Honor, Diana Doan of Pretrial

3 Services.   We would ask that the Defendant be placed on home

4 detention.  And given --

5    THE COURT:  That's what I did.

6    OFFICER DOAN:   Okay.   And given Defendant's prior

7 criminal history with possession of a controlled substance, we'd

8 ask for drug testing and/or outpatient services at this time.

9    THE COURT:  That's fine.

10    OFFICER DOAN:  Thank you, Your Honor.

11    THE COURT:  There's one other condition I'm going to add

12 that's not typical of federal court conditions.  But I am going to

13 add it.  I am going to add a Fourth waiver.  So law enforcement

14 will be able to enter your home at any time of the day or night,

15 with or without a warrant, to inspect your home or vehicle.

16    Do you understand?

17    MR. TRIPPE:  Yes, sir.  I do.

18    THE COURT:  All right.

19    MS. WU:  Your Honor, will the Fourth Amendment waiver

20 extend to his cell phone?  It is of particular concern --

21    THE COURT:  Yeah.  I have no problem with that.  All

22 right.  Ms. Wu, now that I've gone through it, go ahead.

23    MS. WU:  Your Honor, the Government is concerned that

24 even with a Fourth Amendment waiver which extends to his cell

25 phone, it cannot mitigate the risks that -- that the Defendant

40

1  poses.   You know, I know you have noted that the physical

2  conditions are not even what you're concerned about.   What the

3  Government is concerned about is his ability to so much as pick up

4  the phone and cause someone to be beaten within an inch of his

5  life.  And so --

6          THE COURT:  Well, I've got to believe that at some point

7  in time -- he's not going to be in jail forever, and so at some

8  point in time, he would be out.  I'm giving him an opportunity.

9  It's on him to comply and if he's going to mess this up, he's

10 going to be in custody and his family's going to lose their homes.

11 So we'll see how that goes.  I mean, I'm going to take a chance on

12 him to do the right thing.  I hope he doesn't let me down.  I pray

13 he doesn't let me down.  But I cam going to take a chance on him.

14         Mr. Kim?

15         OFFICER KIM:  Your Honor, Daniel Kim from Pretrial

16 Services.   Regarding the Fourth waiver, Your Honor, is that

17 condition limited to law enforcement officers only, or does that

18 include Pretrial Services as well?

19         THE COURT:  Pretrial also.

20         OFFICER KIM:  Understood, Your Honor.

21         MS. WU:  Your Honor, respectfully, I understand that you

22 have made a reasoned decision and, you know, noting that you do

23 have other matters to hear today, the Government is going to

24 respectfully request that you stay the order until the close of

25 business tomorrow to grant the Government an opportunity to appeal

1    and request a transcript.

2            THE COURT:  Well, I have no problem with that.  But

3    there's zero chance they would have this bond package and

4    everything together with the appraisal and everything by tomorrow

5    anyway, but I have no problem staying it.

6            MS. WU:  I would never underestimate the power of Mr.

7    Haddad.  He is very well-respected in the resources community, and

8    so I do appreciate the stay of the order until the end of business

9    tomorrow.

10           THE COURT:  That is fine.  Mr. Kim, did you have

11   something else?

12           OFFICER KIM:  Yes, Your Honor.  Would Your Honor also

13   consider releasing of third party -- or confidential information

14   to third parties in the case that we need to cooperate with law

15   enforcement?

16           THE COURT:  Yes.  Yes.  Is that -- I don't think that's

17   on here, is it?

18           OFFICER KIM:  No, Your Honor.

19           THE COURT:  Yes.  I would -- I would grant that.

20   Anything further from anyone?

21           MR. HADDAD:  I'm afraid to ask for any more.

22           THE COURT:  Go ahead.

23           MR. HADDAD:  Except -- no.

24           THE COURT:  All right.  Mr. Trippe, I'm not sure if

25   you're going to get out of custody or not but, if you do, it's on

1   you to comply.  I hope you do.  I would have no problem forfeiting

2   your bond and putting you back in custody if you mess up.  I pray

3   that you don't.

4            MR. TRIPPE:  Yes, sir.

5            THE COURT:  Good luck.

6            MR. TRIPPE:  Thank you, Your Honor.

7            THE COURT:  Thank you, all.

8            MS. WU:  Thank you, Your Honor.

9            THE COURT:  Thank you, Ms. Wu.

10      (Proceedings adjourned at 3:37 p.m.)

11

12            I, Peggy Schuerger, certify that the foregoing is a

13   correct transcript from the official electronic sound recording

14   provided to me of the proceedings in the above-entitled matter.

15

16   _____/S/ Peggy Schuerger_____        June 17, 2022_____
     Signature of Approved Transcriber        Date
17
     Peggy Schuerger_____
18   ***Ad Hoc Reporting***
     Approved Transcription Provider
19   for the U.S. District Court,
     Southern District of California
20

21

22

23

24

25